Case 1:64-cv-03787-LLS   Document 61   Filed 12/19/13   Page 1 of 14

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/19/13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - -X
BROADCAST MUSIC, INC.,

               Petitioner,

    - against -

PANDORA MEDIA, INC.,

               Respondent,

SONY/ATV MUSIC PUBLISHING LLC,
EMI MUSIC PUBLISHING,
UNIVERSAL MUSIC PUBLISHING, INC.

               Intervenors.

- - - - - - - - - - - - - - - - -X

13 Civ. 4037 (LLS)

Related to 64 Civ. 3787 (LLS)

**OPINION & ORDER**

    This case grows out of a series of "withdrawals" of digital rights, by music publishers affiliated with Broadcast Music Inc ("BMI") from Pandora Media, Inc. ("Pandora") and other "New Media Services."  BMI's petition seeks an order exercising the Court's rate-setting authority under article XIV of the BMI Consent Decree[1], setting reasonable music license terms and fees after giving effect to the withdrawals, for performances of the remainder of the compositions in BMI's repertory.

---

[1] United States v. Broadcast Music, Inc., 1966 Trade Cas. (CCH) ¶ 71,941 (S.D.N.Y. 1966), as amended by, 1996-1 Trade Cas. (CCH) ¶ 71,378 (S.D.N.Y. 1994).

Moving for partial summary judgment, Pandora argues that the withdrawals are ineffectual, because the antitrust consent decree under which BMI operates requires BMI to offer a license to Pandora to perform all of the compositions in the BMI repertory as of January 1, 2013, despite the fact that certain music publishers have by agreement with BMI withdrawn from BMI the right to license their compositions to so-called "New Media Services" such as Pandora.

However, the BMI Consent Decree requires BMI to offer Pandora a license to perform all of the compositions in its repertory. When BMI no longer is authorized by music publisher copyright holders to license their compositions to Pandora and New Media Services, those compositions are no longer eligible for inclusion in BMI's repertory. BMI can no longer license them to Pandora or any other applicant.

Accordingly, Pandora's motion for summary judgment is denied.

## BACKGROUND

BMI is a non-profit performing rights organization ("PRO") that licenses non-exclusive rights of public performance to a variety of music users on behalf of affiliates who are the music compositions' copyright holders. BMI's affiliates comprise approximately 600,000 composers, songwriters and music

publishers, and BMI's repertory consists of approximately 7.5 million musical compositions.

Pandora is a streaming internet radio service that plays music compositions licensed directly from their copyright holders, or through BMI and other PROs.

### A. THE BMI CONSENT DECREE

BMI's ability to license the public performance rights of its musical repertory is governed by the Consent Decree settling this antitrust suit brought by the United States. An amendment to the BMI Consent Decree establishes this Court as a "rate court," which sets fees for licenses when BMI and applicants cannot agree on a reasonable fee. BMI Consent Decree Art. XIII. The Decree also imposes certain conditions and requirements on BMI's issuance of licenses.

Section VII(B) of the BMI Consent Decree states in relevant part: "Defendant shall, upon the request of any unlicensed broadcaster, license the rights publicly to perform its repertory by broadcasting on either a per program or per programming period basis, at defendant's option."

Section IX(C) of the BMI Consent Decree states:

> Defendant shall not, in connection with any offer to license by it the public performance of musical compositions by music users other than broadcasters, refuse to offer a license at a price or prices to be fixed by defendant with the consent of the copyright proprietor for the performance of such specific (i.e., per piece) musical

compositions, the use of which shall be requested by the prospective licensee.

Although not explicitly mentioned in the BMI Consent Decree, "Traditionally, the BMI's license of choice has been a 'blanket license,' a license that grants the licensee access to BMI's entire repertory in exchange for an annual fee." United States v. Broadcast Music, Inc., 275 F.3d 168, 172 (2d Cir. 2001). As defined by Section II(C) of the BMI Consent Decree, "'Defendant's repertory' means those compositions, the right of public performance of which defendant has or hereafter shall have the right to license or sublicense." BMI Consent Decree Art. II(C).

Section VIII(A) provides: "Defendant shall not enter into, recognize as valid or perform any performing rights license agreement which shall result in discriminating in rates or terms between licensees similarly situated."

Section XIV(A) states:

Subject to all provisions of this Final Judgment, defendant shall, within ninety (90) days of its receipt of a written application from an applicant for a license for the right of public performance of any, some or all of the compositions in defendant's repertory, advise the applicant in writing of the fee which it deems reasonable for the license requested.

If BMI and an applicant cannot agree on a license fee, either party may apply to this Court for the determination of a reasonable license fee. Id.

## B. DEALINGS BETWEEN BMI & PANDORA

On June 30, 2005, Pandora and BMI entered into a standard blanket form license agreement which allowed Pandora to stream all the music compositions in BMI's repertory. Kennedy Decl. ¶¶ 8-9. In 2012, Pandora determined that the terms of this license were no longer appropriate for its business, and terminated it effective December 31, 2012. Id. ¶ 9. After the parties failed to negotiate a new type of license, Pandora filed a written application with BMI for a five-year blanket license beginning January 1, 2013, id., which it may have later wholly or partly withdrawn. While the parties were in negotiations, BMI filed its petition with the Court for the determination of reasonable license fees on June 13, 2013 (Dkt. No. 1). BMI and Pandora have negotiated interim license fees to be in effect from January 1, 2013 until the parties negotiate an agreed rate or the Court issues a final order setting license terms and fees. BMI Petition ¶ 55.

## C. PUBLISHER WITHDRAWALS OF NEW MEDIA LICENSING RIGHTS FROM BMI

Effective January 1, 2013, BMI allowed its affiliate publishers (the intervenors and others) to elect Digital Rights Withdrawal and modify their affiliation agreements to exclude BMI's right to license "New Media Transmissions by New Media

Services,"[2] hereinafter referred to as "New Media licensing rights." Guidelines for Digital Rights Withdrawal ("Guidelines"), available at http://www.bmi.

---

[2] The Digital Rights Withdrawal Addendum to BMI's publisher affiliation agreement provides the following definitions:

1. <u>Definitions</u>.

   a. A "New Media Transmission" shall mean:

      i. a digital audio transmission that, in addition to requiring a public performance license, also requires the music user to comply with the license requirements of 17 U.S.C. § 114, § 115 and/or § 106(1);

      ii. a digital transmission of a music video or user-uploaded video (i.e., a video uploaded to the service by the end-user) that, in addition to requiring a public performance license, also requires that the service, in order to offer the music video or user-uploaded video on or via the service, obtain a license directly from the owner or administrator of the rights in the musical composition(s) embodied therein for rights other than the right of public performance (e.g., synchronization or mechanical rights); and/or

      iii. a digital transmission made from a digital music file either (a) uploaded by an end-user to the server and/or (b) matched from a file on the end-user's computer or device to a digital music file on the Service's server (such server, in either case, often referred to as either the "cloud" or a "locker").

   b. "New Media Service" shall mean a standalone service by which New Media Transmissions of musical compositions are made available or accessible (i) primarily by means of the Internet, a wireless mobile telecommunications network, and/or acomputer network and (ii) to the public, whether or not, in exchange

com/entry/guidelines_for_digital_rights_withdrawal (As of September 16, 2013). The modification was set forth in an addendum which states:

> This addendum ("Addendum") to the publisher affiliation agreement will confirm the understanding of BMI and _____ ("Publisher") with respect to Publisher's desire to withdraw the right to license certain digital transmissions (the "New Media Transmissions" as defined below) of musical works licensed to BMI (the "Publisher Works" as defined below).

DiMona Decl., Ex. G, Digital Rights Withdrawal Addendum, p. 1.

The parties (BMI and publisher) Accepted and Agreed:

> For the avoidance of doubt, as of the Effective Date of Withdrawal, Publisher shall have the exclusive right to license New Media Transmissions of Identified Interests and Corresponding Interests in Publisher Repertoire, Related Repertoire, and Administered Repertoire and BMI shall no longer have any right to license New Media Transmissions of Identified Interests and Corresponding Interests in such repertoire for the remainder of the Term.

Id. at p. 3.

> BMI publicly announced:
>
> Rights withdrawal does not affect any of BMI's other licensing activities. It does not affect BMI's right to license traditional broadcast, cable and satellite transmissions, or their related new media transmissions. BMI continues to have the right to license all other digital uses, even for publishers that have withdrawn from BMI the limited digital rights defined above for new media services.

---

> for a subscription fee, other fee or charge; and whether or not such offering includes exposure to advertisements before, during and/or after the transmission of such compositions . . . .

Scope of Digital Rights Withdrawal, <u>available at</u> http://www.bmi.com/licensing/entry/drw (as of July 29, 2013). Compositions licensed to BMI from affiliates other than the withdrawing publishers are unaffected, and "Catalogs that are subject to Digital Rights Withdrawal will be restored to the BMI repertoire if they are acquired or newly administered by an Affiliate that has not elected Digital Rights Withdrawal." Guidelines p. 2.

In September 2012, Sony/EMI[3] became the first publisher to announce its planned withdrawal of New Media licensing rights from BMI. Pandora's Motion p. 9. Pandora negotiated direct licenses with Sony/EMI for the year 2013. Kennedy Decl. ¶ 10.

On November 1, 2013, Pandora filed this motion for partial summary judgment. Pandora seeks a determination that, as the compositions are held in BMI's repertory, BMI must offer them to Pandora without regard to the publishers' putative withdrawals of BMI's right to do so.

Sony/EMI and fellow publisher Universal Music Publishing Group's motions to intervene in this case were granted on November 4, 2013 (Dkt. No. 28).

---

[3]"Sony/EMI" refers to the combined catalogs of Sony and EMI; Sony/ATV became the administrator of EMI's catalog in July 2012.

## DISCUSSION

Pandora argues that the publisher withdrawals do not affect the scope of its license, and points to Sections VIII(A) and XIV(A) of the BMI Consent Decree which require BMI to grant a continuing license to perform "all of the compositions in the defendant's repertory" pending rate proceedings or negotiations. The BMI Consent Decree requires that all compositions in the BMI repertory be offered to all applicants.

Under Section XIV of the BMI Consent Decree, when an applicant requests a license for "any, some or all of the compositions in defendant's repertory," BMI must grant a license for performance of the requested compositions, which may range from "any" (a "per piece" license) to "all" (a blanket license). Under the BMI Consent Decree, these options are open to all applicants, with fees that do not discriminate between applicants similarly situated. By placing a composition in the BMI repertory, the affiliate routinely authorizes its inclusion in blanket licenses of BMI's whole repertory to all applicants.

But if the withdrawal of its authority to do so by some affiliates with respect to compositions for which they own or administer the copyrights is within those affiliates' rights, BMI cannot offer New Media licensing rights for those compositions to New Media applicants, including Pandora. If BMI cannot offer those compositions to New Media applicants, their

availability does not meet the standards of the BMI Consent Decree, and they cannot be held in BMI's repertory. Since they are not in BMI's repertory, BMI cannot deal in or license those compositions to anyone.

As copyright holders, the publishers may divide their copyrights pursuant to Section 106 of the Copyright Act, 17 U.S.C. § 106, which provides:

> Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
>
> . . .
>
> (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
>
> (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;
>
> (5) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

The publishers are privileged to license, or not license, the performance of their compositions as they see fit. In the exercise of that right the publishers have agreed with BMI to withdraw their New Media performance licensing rights from Pandora and New Media Services. That is well within their power as copyright holders. See United States v. Am Soc'y of Composers, Authors & Publishers (In re Application of Yahoo!

Inc.), 627 F.3d 64, 71 (2d Cir. 2010) ("The Copyright Act confers upon the owner of a copyright a bundle of discrete exclusive rights, each of which may be transferred or retained separately by the copyright owner.") (citing and quoting New York Times Co. v. Tasini, 533 U.S. 483 (2001)); Buffalo Broad. Co. v. Am. Soc'y of Composers, Authors & Publishers, 744 F.2d 917, 920 (2d Cir. 1984) ("The Act specifically accords the copyright owner the right to authorize others to use the various rights recognized by the Act, including the performing right and the reproduction right, and to convey these rights separately.") (citing Copyright Act). Thus, the copyright holders have the right to withdraw from BMI its authority to license the performance of their compositions by the New Media Services.

It is the BMI Consent Decree (and the antitrust law) which restrict BMI from carrying in its repertory compositions which it can no longer offer to the New Media Services, who were up until recently accepted as legitimate, qualified, licensed and performing those works. BMI's repertory consists of compositions whose performance BMI "has the right to license or sublicense"; it "shall upon the request of any unlicensed broadcaster, license the rights publicly to perform its repertory". BMI Consent Decree Arts. II(C); VII(B). When portions of that right are withdrawn, the affected compositions

are no longer eligible for membership in BMI's repertory, and it cannot include them in a blanket license or license them at all.

BMI contends that its long-standing inability to license the "grand right" (the right of public dramatic performance) shows that there is no universal right to licenses to perform all the compositions in its repertory. BMI Brief pp. 6-9. But BMI has never offered grand theater rights. All applicants are treated equally: BMI cannot grant licenses for grand theater performances to anybody. They are a commodity in which BMI does not deal. In contrast, New Media licensing rights have until recently been offered to any and all applicants; they have been accepted by, licensed to and exercised by the New Media Services, and (except for those now withdrawn by some publishers from New Media applicants) the affected compositions are still offered by BMI to all applicants other than New Media. Indeed, the withdrawal guidelines themselves recognize that when a withdrawing publisher's catalog is transferred to another affiliate who has not withdrawn their compositions from New Media Services, compositions in the transferred catalog are "restored to the BMI repertoire." Guidelines p. 2. Thus, the "grand rights" example has no analog in, and nothing to do with the issues in this case.

It is similarly immaterial that BMI cannot offer certain synchronization rights (the right to license musical

compositions in conjunction with visual images) or rights for jukebox licenses and noncommercial broadcasters, which are statutorily excluded from BMI's purview because of the operation of the Copyright Act, 17 U.S.C. §§ 116, 118. The publishers are free to license these rights to all music users. But BMI does not offer, nor has it ever offered, these rights to anybody.

BMI and the intervenors argue that nothing in the BMI Consent Decree prevents BMI from agreeing not to serve particular customers. That puts matters backwards. Nothing in the Consent Decree settling this antitrust case can be read to allow one with BMI's market power to refuse to deal with certain of its applicants. The copyright law necessarily gives that privilege to the intervenors, but BMI cannot combine with them by holding in its repertory compositions that come with an invitation to a boycott attached.[4]

---

[4] The Department of Justice has submitted its views, which deplore the creation of any avoidable inconsistency between this decision and the earlier one of the Honorable Denise Cote, U.S.D.J., In re petition of Pandora Media, Inc., No. 12 Civ. 8035 (DLC), slip. op. (S.D.N.Y. Sept. 17, 2013). The inconsistency is just a difference of view of the power of the application of Section 106 and the copyright holders' rights under the Copyright Law, and will be resolved by the Court of Appeals for the Second Circuit or decree amendment procedures, or managed commercially.

## CONCLUSION

Pandora's motion is denied. The relevant compositions are not within BMI's repertory, and it lacks the power to license them to any applicant, including Pandora.

Nothing in this opinion affects the right of licensees to continue to perform the withdrawn compositions under presently-existing licenses. They were legal when made, and the rights they granted are not to be altered retroactively. As far as this ruling is concerned, they continue according to their terms until their expiration.

So ordered.

Dated:   New York, New York
         December 18, 2013

                                    _____
                                         LOUIS L. STANTON
                                             U.S.D.J.