# Exhibit A

CONFIDENTIAL SUBMISSION

# MEMORANDUM

To:   Ethan C. Glass, Esq.                                                      June 18, 2015
      U.S. Department of Justice

From: Broadcast Music, Inc.

Re:   CID No. 27628/ The Licensing of a Partial
      Interest to Perform a Musical Composition

BMI submits this paper to raise a new issue[1] with the Staff – the impact of the interplay of the free-market ability of a copyright co-owner to license a fractional interest in a musical composition (that is, a license that is conditioned on the licensee's also obtaining permission from the other co-owners, thereby eliminating any obligation to account to co-owners for license fees received) and the consent decree's arguable requirement that BMI license a composition in full even if BMI has obtained the right to grant licenses from only one co-owner. We believe that the Staff should consider, moreover, the current evolution of the marketplace and how BMI's current decree obligations may prohibit it from responding to this evolution.

## BACKGROUND

For centuries, and certainly throughout the last century, it has been common practice among songwriters to collaborate in the creation of musical compositions. Some of the greatest songwriters have worked in pairs or teams, sometimes to write a single song and sometimes for long stretches of their careers. To cite just a few from the modern era: King and Goffin (e.g., "Will You Love Me Tomorrow"), Holland Dozier Holland (e.g., "Baby I Need Your Loving"),

---

1. We acknowledge your letter of June 15 on this topic. We are responding separately to that letter, but this paper comes at the topic from a very different perspective than your letter—which we believe to be based on fundamentally false assumptions about BMI's conduct and plans. BMI seeks freedom to *respond* to market forces, not to suppress them.

1

**CONFIDENTIAL SUBMISSION**

Lennon and McCartney, Redding and Cropper ("(Sittin' On) The Dock Of The Bay"), Gamble and Huff (e.g., "Love Train"), and Jagger and Richards. This feature of musical creation continues today. Sometimes co-writers share the same publisher; sometimes not. Sometimes they share the same PRO; sometimes not.

In cultural terms, the freedom of songwriters to team up for short or long periods in varying combinations is an important spur to their creativity. In antitrust terms, songwriters' freedom to choose and change collaborators whenever they are inspired to do so is a source of innovation, productivity, product quality and output enhancement.

Copyright law has followed common law property law principles in initially treating the authors of a jointly created composition as tenants in common. *See Davis v. Blige*, 505 F.3d 90, 98 (2d Cir. 2007) ("authors of a joint work are co-owners of copyright to the work, and . . . are to be treated generally as tenants in common."). The co-owners may have differing fractional shares according to their agreement, but they begin by owning those shares as "undivided" interests in the unitary copyright as a whole. *See id.* For undivided copyrights, similarly to undivided tenancies in common in real estate, each co-owner is free to make use of the entire property on a non-exclusive basis, subject to a duty to account to all other co-owners for profits earned. *See id.* (each co-owner has the independent right to license a work "subject to a duty of accounting to the other co-owners for any profits").

Nevertheless, as with other tenancies in common, co-owners of copyrights are free to divide up their interests as they see fit and thereby limit each co-owner's right to license independently. *See* 1 Nimmer on Copyright § 6.09 (joint owners of a copyright may, by contract, vary from the default rules governing joint ownership). For instance, they are free to agree among themselves that the consent of the others is required in each instance, or that each

**CONFIDENTIAL SUBMISSION**

will grant licenses on her own terms but subject to the licensee's obtaining additional licenses from the other co-owners.  *See id.* § 6.10 [C] ("An agreement between joint owners that no one of them shall have the right to license the work without the consent of the others will be binding on the parties to the agreement and will also bind any third party licensee taking with notice of such a restriction." (footnotes omitted)).

      Unrestricted divisibility of copyright is one of the signal features of the Copyright Act of 1976, expressly intended to benefit songwriters and other authors by giving them more flexibility to exploit their copyrights in a profit-maximizing way.  *See* 17 U.S.C. § 201(d)(1) ("The ownership of a copyright may be transferred in whole or in part"); 17 U.S.C. § 201(d)(1) ("Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred . . . and owned separately."); *Harper & Row, Publishers., Inc. v. Nation Enterprises*, 471 U.S. 539, 546 (1985) ("Section 106 of the Copyright Act confers a bundle of exclusive rights to the owner of the copyright"); *see also* U.S. Copyright Office, *General Guide to the Copyright Act of 1976* (September 1977) at 5:4-5:5 (noting the shift from pre-1976 Act understanding of a copyright as "a single, indivisible entity" to the current regime under the 1976 Act, which recognizes the importance of the divisibility of copyrights).

      Until now, co-owners of songs have had little reason to exercise their rights to vary from the default tenancy-in-common rule with respect to public performance rights.  This is because virtually all co-owners of songs were affiliates of a PRO, and virtually all public performers of music held licenses from all PROs, covering their entire repertoire.  As a result, even when a song is owned by multiple persons affiliated with multiple PROs, and despite the potential argument that any single license from any interest holder was sufficient to perform the composition, all songwriters and all publishers have licensed through, and been paid separately

**CONFIDENTIAL SUBMISSION**

and proportionately by, their respective PROs for performances of the co-owned songs. There has been no need for writers or publishers to check up on whether co-owners were doing a good job of licensing the song, no need to account to each other, and no need for publishers to audit each other. Thus, the status quo is that performing rights in most co-written songs are held as tenancies in common, even where the publishers are different entities, and even where different PROs represent the publishers and writers.

Both publishers and music users recognize that this status quo is now unstable as a result of the prospect of partial or full withdrawals by publishers from PROs, the rise of unregulated PROs, and the possibility that significant music users might choose to be selective in acquiring music performing rights instead of seeking comprehensive (i.e., blanket) licenses covering all songs.

## DISCUSSION

We understand the Staff has had discussions with interested parties on this topic, as has BMI. We expect that different interested parties will have different positions on this. We further expect that the Department would prefer not to address issues of copyright law in its discussions regarding the modification of the PRO consent decrees.

However, we believe that the potential of digital rights withdrawal – and, in any event, the likelihood of future publisher terminations from PROs and the rise of unregulated entities such as GMR and SESAC – will bring these issues to the forefront and could prove disruptive to the performance rights marketplace.

Moreover, as we discuss below, we see the identified issues as resulting not simply from the functioning of copyright law in isolation. Rather the issue that concerns BMI flows from the interplay between the potential for fractional-licensing practices in the marketplace and the

**CONFIDENTIAL SUBMISSION**

mandatory license provision of BMI's consent decree, which has been construed to compel BMI to grant licenses to perform the "composition" – not merely the partial interest in the composition owned by BMI's affiliate.

As the Staff itself has observed in our discussions, an entire marketplace has developed in reliance on certain rules and expectations. The issue of whether owners of all interests in a composition must grant permission was never raised – as noted – because music users historically availed themselves of blanket licenses and co-owners received fractional distributions from their respective PROs based on their percentage ownership.[2]

With the rise of additional licensors – and additional licensing obligations – we would not be surprised to see music users challenge this long-established approach to music licensing. Instead of obtaining licenses from all owners of co-owned compositions, they might think it attractive to search out minority co-owners or try to play co-owners off against each other. Moreover, a music user might try to rely on a PRO blanket license to avoid paying a withdrawing co-publisher that sought to license the music user directly at free-market prices.

By the same token, we also think it likely that copyright owners in the marketplace will start to modify or eliminate their tenancies in common and gravitate to fractional ownership and fractional licensing. There are strong market and efficiency incentives for them to do this. For one thing, they might believe they could do a better job themselves and might not wish to be

---

2. The exception has been with respect to performances of co-owned songs on local television stations holding per program licenses. Today, when such a station broadcasts a program containing songs of only one PRO (e.g., BMI) with the exception of co-written songs that also have a co-owner affiliated with another PRO (e.g., ASCAP), the station only pays BMI (in this example) for that program and the co-writer affiliated with ASCAP (in this example) is uncompensated by ASCAP, BMI, or his co-writers affiliated with BMI.

5

**CONFIDENTIAL SUBMISSION**

beholden to co-owners to make favorable deals for them.[3]  Typically, we expect direct licensing to be done on a catalog-wide basis, not song by song, and each publisher is looking out for its own writers rather than the collaborators of their songwriters for particular compositions. Publishers also would have good reason not to reveal their catalog-wide licensing deals to co-publishers of individual compositions with which they generally compete.  Nor would publishers necessarily wish to have to accept accountings from co-owning publishers with which they otherwise compete.  Indeed, we expect that some music users will actually prefer to negotiate and administer deals with each co-owner independently to ensure that all rights holders get paid rather than relying on a single licensor to account to its co-owners.[4]

Similarly, publishers seeking to license their catalogs directly would not want to face the unintended consequence of being subject to PRO price regulation for some of their songs after withholding them from the PRO – even after they have agreed with their co-owners to each license their own fractional interests.  Yet the BMI consent decree has been construed arguably to require BMI to license each composition in its repertoire as a whole, regardless of the owners' decision to divide their ownership interests.

Accordingly, we believe that the Staff and PROs cannot avoid coming to terms with these difficult issues.  We offer a solution and suggest in any event that such issues, at a minimum, must be explored and discussed in full with the Staff.

---

3. Unlike other co-venturers that choose to do business together, when two publishers are co-owners of a song, that is because *their songwriters* chose to collaborate with each other in creating one or more songs, usually for artistic rather than business reasons.  It would be bad policy – a check on innovation – if artistic collaboration were constrained by concerns about assurance of payment by a co-writer, co-publisher or the co-publisher's PRO.

4. Indeed, we believe that some negotiations are already occurring in this manner.

**CONFIDENTIAL SUBMISSION**

# REDACTED

**CONFIDENTIAL SUBMISSION**

**Likelihood of Litigation**

We believe that the Staff would agree that almost certainly there will be litigation that centers on the issues surrounding fractional licensing. We can expect that users may reject the demands of a withdrawn or terminated publisher and rely on the license from a composition's other co-owner (either via a PRO license or a direct license from that co-owner/publisher).[6] We can further expect a lawsuit to ensue, where the withdrawn/terminated publisher will sue the music user, who will seek indemnification from the PRO or direct-licensing co-publisher.

Alternatively, a withdrawn publisher may seek a declaratory judgment against the PRO or co-publisher regarding whether the PRO or co-publisher can license a composition it co-owns without its consent.

To be clear, we are not asking the Staff to prevent these actions from occurring – that is the province of copyright law and the courts. We are simply noting that litigation will occur, and the existing consent decree provision could leave BMI unable to engage in licensing in the manner that the courts, or the developing trends of the marketplace, dictate.

Further, as discussed immediately below, the asymmetry between how BMI licenses and how the unregulated forces in the marketplace license will cause unintended harm to the market.

---

6. At the recently-completed BMI/Pandora rate trial, Pandora's attorney Ken Steinthal asked BMI's economic witness Pierre Cremieux whether, where one publisher in a co-written composition has left BMI but the other co-publisher remains, the BMI licensee can continue to perform the composition and does not need to seek the permission of the withdrawn publisher. Cremieux, while stating he was not an attorney, said that that was his understanding. Steinthal said in response, "We may call you as a witness in some other lawsuits. I'm just kidding." Trial Tr., *Broadcast Music, Inc. v. Pandora Media, Inc.*, No. 13 CV 4037 (S.D.N.Y. Mar. 3, 2015), at 1842.

   Mr. Steinthal may have been kidding about calling Dr. Cremieux, but not about the likelihood of future lawsuits on this very issue.

8

**CONFIDENTIAL SUBMISSION**

**Harm to the Rights Market**

<u>Non-Competitive Devaluation of Musical Compositions</u>:  Faced with demands of publishers seeking to license away from the shadow of the rate court, music users may take two steps that will lead to a devaluation of the creative compositions of all songwriters, composers and publishers.

First, the music users will – as they arguably can under the current consent decree – seek to require BMI to provide unconditional licenses to perform all "compositions" in its repertoire, as has been the case under BMI's local television per program license, while challenging BMI's share-of-performances information and rights relative to ASCAP's and relative to withdrawn publishers and unregulated PROs.  They would argue that BMI should not be credited for all of a composition if only one of the co-publishers is a BMI affiliate.  We would also expect the music users to ignore the operational difficulty and inefficiency BMI would face in attempting to pay and account to unaffiliated co-owners if required to license full compositions.

Second, the user would insist to the non-PRO, or withdrawn or terminated co-owners of such compositions, that it did not require any further license to perform the composition, and could pick and choose which co-owner (or co-owner's PRO) it wished to pay on the basis of its fractional share.

We would also face the prospect that music users would seek to avoid payment by claiming to BMI that it owed no fee because it was relying on some other license, while (accidentally or otherwise) making a similar claim to the representatives of other co-owners.

The end result would be that the user would seek to pay BMI only a fraction of the value of a composition to perform the composition—as has been the case under the local television per program licenses.  If BMI were to receive only a fraction of the value of a performance of a

9

composition, but still be required to account to non-affiliated co-owners from that fraction, all co-owners would receive less than they are due.  Under such circumstances, we would fully expect publishers to terminate their affiliations with BMI rather than risk the widespread, artificial devaluation of their catalogs.

We think the Department would agree that the gaming of the market hypothesized above – where a user pays for a fractional interest in a composition but obtains the full right to perform the composition – does not reflect the results of competition, but rather of regulatory mismatch. It is one thing to take the position that PROs and affiliated publishers compete with each other, seeking more performances for lower prices[7]; it is quite another for lower prices to be obtained via the abuse of the mandatory licensing rules in order to pay a fraction of a composition's value for a full performance.[8]

<u>Disproportionate Indemnification Liability</u>: Without a change to the consent decree, BMI would be required to license the composition on behalf of affiliates and non-affiliates alike. Having obtained a license authorizing performance of a composition *in toto*, BMI's licensees will insist that BMI's indemnification provisions also cover the entire composition.  In an era where copyright obligations will most certainly be challenged in the courts by music users or unregulated publishers and PROs, BMI should not be the music industry's insurer against uncertainties in copyright law or ownership disputes not involving its affiliates, as the market develops.

---

7. A position we will, respectfully, continue to question, and one which Judge Stanton rejected in his recent decision in the BMI/Pandora rate matter. *Broadcast Music, Inc. v. Pandora*, 13 Civ. 4037, ECF No. 242 (S.D.N.Y. May 28, 2015) at 52 ("BMI is not a competitor to the publishers.  It is the agency through which they market their music.").

8. Please be assured that we are not at this time seeking the elimination of BMI's mandatory licensing obligations.  We are simply suggesting that the decree must in some other way ensure that BMI can license in the same manner as the rest of the market does.

CONFIDENTIAL SUBMISSION

**This Is a Consent Decree Issue.**

The issue we are identifying is not the consequence of copyright law, which fully permits co-owners to agree to share-based licensing.

The issue we identify is, rather, the imbalance that would be created if the market embraced the fractional licensing of interests and BMI were *unable*, under its consent decree, to license its affiliate's interest in a similar manner.

BMI could face a licensing landscape where withdrawn publishers and unregulated PROs could license a fractional interest in their compositions – because (a) the courts upheld the practice, (b) the marketplace voluntarily accepted the practice, and/or (c) co-owner/publishers entered into bilateral agreements with other co-owner/publisher requiring the consent of all co-owners in licensing co-owned compositions (as is fully permissible under copyright law).  In such a landscape, BMI arguably could not, under its current decree, license on similar, fractional terms.  We believe that, over time, this limitation would deter publishers or other content owners from affiliating with BMI.

<u>Avoidance of Obligations to Creators</u>:  While PROs and music users may disagree on the rates of their license agreements, historically these users have by and large honored the need to compensate each right holder and to pay 100% of a composition's value for 100% of the interests in a composition.  Barring a change in the rules applicable to PRO/music user negotiations, there is a very real potential for this mutually beneficial model to unravel, and quickly.[9]  BMI has

---

9. The strategy of music users licensing one PRO's compositions to avoid an obligation to the other for co-written compositions under the current per program licenses is a topic for another day.  While this very real and current phenomenon in per program licensing (see n.2, *supra*) could be seen as an anomalous departure from traditional behavior, it could as easily be seen instead as an insight into how the licensing world might operate if users were incentivized or permitted to avoid their obligations to all interest holders.

**CONFIDENTIAL SUBMISSION**

already been asked by a number of customers if they can rely on the BMI license as permitting them to perform the composition notwithstanding a share of the composition being controlled by GMR, making it very clear that they were weighing whether to take the position with GMR that there is no need for a GMR license with respect to these split compositions.

If BMI is not permitted to adapt to fractional licensing along with the rest of the market, this will also put BMI out of step with foreign licensing practices.  In Europe, fractional licensing is the norm for publishers who license directly to music users such as Apple and YouTube. When a composition is jointly owned by two different publishers using different pan-European licensing agents, digital music licensees report to and pay each of those agents separately according to their fractional interests, on terms negotiated separately by those agents.  Foreign rights holders and foreign PROs will be in a stronger position than BMI to protect their writers of co-written songs unless BMI is placed on the same legal plane.  Moreover, certain music users might prefer to follow the model employed in Europe to the extent that it would enable them to simplify their payment processes.

Moreover, to the extent BMI is restricted from fractional licensing, performing rights will be out of step with standard industry practice for licensing sync and mechanical rights, which are already licensed on a fractional basis.

**In Any Event, BMI Should Stand in the Shoes of its Affiliates.**

Our understanding is that at least one publisher has suggested to the Staff a rule that would limit a PRO to licensing its own affiliates' fractional interests in co-owned compositions, while retaining the ability of a publisher to license (under applicable doctrines of copyright law, presumably) 100% of the same co-owned composition.  We must respectfully disagree in the strongest terms with this approach.

**CONFIDENTIAL SUBMISSION**

First, the nature of an affiliate's grant to BMI is to give BMI whatever performance rights that affiliate has in its musical compositions. There is simply no effective difference between BMI's legal standing vis-à-vis its compositions and that of a publisher.[10] If a composition remains subject to a tenancy in common, BMI should remain free to license the composition unconditionally.

Second, to allow such an approach would create an asymmetry from which the market – and certainly the PROs – would not recover. BMI's affiliated songwriters and publishers would take into account that BMI could not license the performance of their split compositions without the constituent shares of other interest holders being licensed, while at the same time, unregulated publishers and organizations such as SESAC and GMR could license these co-owned compositions themselves without any further agreements (and, of course, would realize the full value of the composition, unconstrained as they are by the mandatory license obligations of the PRO consent decrees). The exodus of BMI's affiliates to these unregulated entities, or the absorption of smaller publishers by the major publishers, would be swift and dramatic.

The distinctions between how BMI's business practices are regulated, on the one hand, and the business practices of the unregulated publishers and entities on the other, should be based on antitrust policies aimed at addressing the potential for anticompetitive behavior. BMI should not be placed in any different position from its unregulated competitors on non-antitrust issues such as whether BMI is licensing an entire composition or its share of the composition. To do so

---

10. Which is different from BMI *acting* as a publisher, as prohibited under the consent decree.

would grant unregulated entities an advantage that has absolutely nothing to do with the purposes of the BMI consent decree.[11]

## CONCLUSION

We do not think that the BMI consent decree is the proper vehicle for amending or clarifying copyright law.  However, other than to address antitrust concerns, the practices of doing business with a PRO, as reflected in their consent decrees, should not be different from those developing in the marketplace, nor should they present opportunities for music users to artificially devalue music at the expense of songwriters, composers and publishers.

The remedy we suggest in this paper will not modify the rights of unregulated publishers or rights organizations.  They will not impact the rates charged by BMI or ASCAP.  They will not represent a modification of copyright law in the slightest.

Our proposal simply recognizes that the decree's apparent requirement of mandatory licensing of the entire composition changes the rights environment.  That was a reality (albeit one whose consequences were not fully explored by any participants) in a world largely licensed by the PROs.  Now, as rights withdrawal, publisher terminations and the entry of unregulated competitors complicate that environment, mandatory licensing will, unless addressed in the manner we suggest, create a host of unintended consequences.

---

11. The need to place BMI on equal footing with unregulated publishers and entities on these non-antitrust-related issues should permeate the Staff's thinking even if the Staff dismisses the demands of publishers to create the specific rules they may be seeking regarding the licensing of partial interests.