


975 F Street NW
Suite 375
Washington, DC 20004
Tel: 202-93-NMPA (6672)

**VIA HAND DELIVERY**

September 13, 2016

Honorable Louis L. Stanton
United States District Court
Southern District of New York
500 Pearl Street, Courtroom 21C
New York, NY 10007-1312

      Re: *United States of America v. Broadcast Music, Inc.*, No. 64 Civ. 3787

Dear Judge Stanton:

      We write on behalf of the National Music Publishers Association ("NMPA") in support of Broadcast Music, Inc.'s ("BMI") anticipated motion seeking: "(1) a declaration that the BMI Consent Decree ("Consent Decree") does not require 100% licensing; (2) in the alternative, a modification of the Consent Decree to allow BMI to license on the basis of the fractional shares owned by its affiliates; and (3) in the event that the Court disagrees with BMI, an order providing BMI with the time necessary to transition to 100% licensing after the issuance of a final order." *See* August 4, 2016 Letter from BMI to the Honorable Louis L. Stanton.

      NMPA respectfully submits this letter as a friend of the Court, in advance of the September 16, 2016, pre-filing conference.[1] The letter briefly summarizes the reasons why the Consent Decree does not require only "full work" or "100%" licensing, notwithstanding the Department of Justice's ("DOJ") proclamation to the contrary. NMPA is happy to submit additional information or participate in the September 16 conference if useful to the Court and the parties.

---

[1] *See U.S. v. Alex. Brown & Sons, Inc.*, 169 F.R.D. 532, 537 (S.D.N.Y. 1996) (court may consider *amicus* briefings in evaluating entry of proposed consent decree); *see also U.S. v. American Cyanamid Co.*, 719 F.2d 558, 562 (2d Cir. 1983) (considering arguments raised by *amicus curiae* in connection with the proposed termination of a consent decree).

1

### A.   Background

The NMPA is a trade association formed to protect the rights of its members: Music publishers and the songwriters they represent who create and license the vast majority of musical compositions enjoyed by listeners in the United States today. The NMPA includes members who are BMI affiliates and own interests in copyrights that are licensed as part of BMI's blanket licenses. These members' interests will be materially, adversely affected by the Department of Justice's "interpretation" of the Consent Decree. The construction of the Consent Decree governs the nature of the licensing authority that NMPA's members are required to grant BMI if they are to be represented by BMI and, indeed, whether their copyright interests in certain types of musical compositions may be represented by BMI at all.

On August 4, 2016, the DOJ issued a public "Closing Statement" interpreting the BMI Consent Decree as (1) to require 100% licensing by BMI and ASCAP of songs in which BMI or ASCAP only represent a fractional interest, and (2) to prohibit BMI and ASCAP from representing fractional interests in songs in which they individually cannot convey a 100% license. By letter dated August 4, 2016, BMI asked this Court for a conference in anticipation of a motion for a declaration that the Consent Decree does not require 100% licensing or, alternatively, a modification of the Consent Decree allowing BMI to continue licensing fractional shares consistent with its "longtime practice."

### B.   Discussion

The entire music industry has operated for decades with the understanding that the Consent Decrees do not require 100% licensing — an understanding that the DOJ has not objected to until now. The Justice Department's sudden and novel interpretation, if permitted, would be materially adverse to the interests of NMPA's members, who are the owners of the musical composition copyrights and who authorize their intellectual property to be licensed through BMI.

As a preliminary matter, the Justice Department's "interpretation" is not really an interpretation of the Consent Decrees Rather, it is a modification of the parties'— and the publishing industry's — longstanding understanding of what the Consent Decrees require.[2] Indeed, the DOJ is attempting to modify the Consent Decree through the guise of an "interpretation" to avoid the burden of proof it would bear in a contested modification proceeding. That this is a modification and not an interpretation is apparent in the fact that the Justice Department has threatened to commence enforcement proceedings unless the music publishing industry immediately begins to comply with the DOJ's new interpretation, and fully

---

[2] *Compare Sierra Club v. Meiburg*, 296 F.3d 1021, 1029 (11th Cir. 2002) ("A district court's interpretation of a consent decree operates as a modification when it changes the legal relationship among the parties. This determination is not significantly affected by whether the district court called its order an interpretation . . . or a modification.").

complies within one year, by modifying its license agreements and making other conforming adjustments.[3]

Accordingly, BMI's requested motion was necessitated by DOJ's announcement that it would not bring enforcement proceedings unless the industry failed to immediately act to change its long-standing practices.[4] The DOJ's "enforcement intention" directly and immediately impacts the NMPA's membership because it owns the rights in question and has relied upon the status quo permitting BMI to issue fractional licenses for decades, as reflected in countless rights-sharing and licensing contracts among and between the writers, their publishers and the PROs.

For the reasons summarized below, NMPA submits that DOJ's enforcement intention and pronouncement concerning the consent decrees are wrong in their application of legal principles, will seriously impair the efficient operation of the marketplace to the detriment of songwriters, music publishers, and music consumers, and will reduce the number of songs that can be practically licensed. DOJ's interpretation conflicts with basic principles of the Copyright Act and with the expressed views of the United States Copyright Office, upends decades of licensing, administration and payments with respect to fractionally owned works under the consent decrees, fails to apply the proper rules of consent decree construction, and ignores the numerous royalty rate rulings by the courts supervising the consent decrees, which have always determined rates based on fractional ownership and licensing by BMI and ASCAP.

1. *Contrary to Practice and Law.*

DOJ's insistence that the Consent Decree require 100% licensing, if accepted, would upend decades of consistent industry practice of licensing of public performance rights in musical compositions only on a fractional basis.[5] Songwriters, music publishers, PROs, music users, and rate courts commonly understand this.[6] There is no dispute that when music licensees

---

[3] U.S. Dep't of Justice, Antitrust Div., Statement on the Closing of the Antitrust Division's Review of the ASCAP and BMI Consent Decrees 17-18 (Aug. 4, 2016), *available at* https://www.justice.gov/atr/file/882101/download;

[4] *See Greenbrier Cinemas, Inc. v. Bell*, No. 77-0035, 1978 WL 1525, at *3-4 (W.D. Va. Jan. 19, 1978) (allowing a declaratory relief action to proceed against DOJ after DOJ issued a press release announcing its intension to pursue enforcement actions against movie theaters engaged in motion picture splits).

[5] DOJ suggests in its August 9, 2016 letter to this Court, that a move to fractional licenses would be an evolution, or change, within the industry. However, for decades, many NMPA members have had fractional right agreements with co-writers and have generally understood when delegating to BMI their fractional interests in split works that they were only granting BMI the right to license their fractional interest, absent some agreement to the contrary with the unaffiliated rights-holders. Indeed, based on this understanding, BMI and other market participants have not set up any common mechanism to account for royalty payments to unaffiliated rights-holders if BMI were to suddenly and unilaterally grant 100% licenses for its entire repertory.

[6] The common industry understanding was noted by the Copyright Office in its report on 100% licensing prepared in response to the request by Rep. Doug Collins: "[T]he fractional licensing of jointly owned musical works—a longstanding practice of the music industry—went unquestioned as a background fact by the many stakeholders who

obtain licenses from BMI, they always have paid royalty rates based on only the fractional interests that the PRO represents. Accordingly, BMI does not account to non-member co-owners or have mechanisms to provide any such accounting as would be required if 100% licenses had been granted. There also has been no expectation, much less reliance, on the part of music licensees that the PROs were licensing 100% rights based on the fractional interests the PROs each represented. Indeed, we know of no instance where a licensee has asserted as a defense in a copyright infringement action that it has a 100% license from BMI or ASCAP.[7] When a new "interpretation" of a 75-year old consent decree is going to fundamentally change the way an industry has operated for decades, it should be treated as a modification and the Justice Department should bear the burden of showing why the change is necessary to effect the purpose of the Consent Decree and why the failure to make the change will result in an anticompetitive effect and harm the public interest.

DOJ's interpretation also fails to properly apply the law governing consent decree construction. Consent decrees are to be interpreted as if they are contracts between the settling parties.[8] Although an unambiguous contract must be enforced according to its terms, the law sensibly recognizes that trade custom and usage can create a latent ambiguity in the contract even if the terms facially appear clear and unambiguous. When this is the case, the contract should be construed to conform to the industry custom so as not to upset a long-standing industry practice in the absence of the contracting parties' clear intention to do so. The Copyright Office agrees:

> Even setting aside the express mandate of the Copyright Act, the decrees—like any contract—must be interpreted in light of the prevailing customs of the industry. Thus, while the consent decrees require ASCAP and BMI to license users to publicly perform their respective "repertoires," each consent decree describes those repertoires in a manner that can, and should, be read consistently with the practice of fractional licensing.[9]

---

participated, including both licensors and licensees." Views of the United States Copyright Office Concerning PRO Licensing of Jointly Owned Works 2 (Jan. 29, 2016) (footnote omitted) [hereinafter Copyright Office Views], *available at* www.copyright.gov/policy/pro-licensing.pdf.

[7] DOJ's interpretation also ignores an open and important question: whether a co-owner of a fractional copyright interest can, consistent with copyright law, delegate to a non-exclusive licensing agent the power to license anything more than the fractional ownership interest possessed by the co-owner. The Justice Department appears to simply assume, without analysis, that because co-owners of a copyright are treated as tenants in common with the right to license the whole, BMI and ASCAP too can license the whole through a grant of licensing rights from a co-owner of the copyright. But BMI and ASCAP are non-exclusive licensees or licensing agents, not co-owners of copyright, and so cannot be delegated a co-owner's authority to issue 100% licenses.

[8] *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 237 (1975).

[9] *See* Copyright Office Views, *supra* note 6, at 13.

The Consent Decree defines BMI's "repertory" as "those compositions, the right of public performance of which defendant has or hereafter shall have the right to license or sublicense." (BMI Decree § II(C)). Consistent with the Copyright Office's own observations, the market has long understood this language to mean that, where an affiliate grants BMI the right to license only a fractional interest, BMI may license that fractional interest as part of its "repertory."

Finally, the rate courts have consistently treated BMI (as well as ASCAP) licenses as fractional and not 100% when setting royalty rates. DOJ has participated in many of these "rate court" proceedings and has never questioned whether fractional licensing is inconsistent with consent decrees. DOJ's new interpretation wrongly suggests that the rate court judges for decades have misperceived the requirements of the BMI and ASCAP licenses.[10]

2.  *Harms the Public Interest.*

In addition to being contrary to law, the DOJ's interpretation harms the public interest. The Register of Copyrights agrees. In an extensive and well-reasoned analysis, the Copyright Office concluded:

> The Office believes that an interpretation of the consent decrees that would require these PROs to engage in 100-percent licensing presents a host of legal and policy concerns. *Such an approach would seemingly vitiate important principles of copyright law, interfere with creative collaborations among songwriters, negate private contracts, and impermissibly expand the reach of the consent decrees. It could also severely undermine the efficacy of ASCAP and BMI*, which today are able to grant blanket licenses covering the vast majority of performances of musical works—a practice that is considered highly efficient by copyright owners and users alike.[11]

DOJ's edict effectively prohibits BMI's longstanding practice of licensing fractional interests in compositions for which it cannot issue 100% licenses. The result, as the Copyright Office observes, of a 100% licensing requirement on BMI (and ASCAP) "might well result in a sharp decrease in repertoire available through these PROs' blanket licenses."[12] There are many

---

[10] The *Pandora* rate court decisions are inapposite, since they only addressed what constitutes a "work" in the ASCAP and BMI repertory and whether some works in a PROs repertory, available to certain categories of users, could be excluded from the repertory as to other categories of users. These decisions provide no guidance whatsoever as to whether the licenses that the Consent Decrees require ASCAP and BMI to issue are fractional or 100% licenses. *See In re Pandora Media, Inc.*, Nos. 12 Civ. 8035(DLC), 41 Civ. 1395(DLC), 2013 WL 5211927 (S.D.N.Y. Sept. 17, 2013), *aff'd per curiam*, 785 F.3d 73 (2d Cir. 2015); *Broadcast Music, Inc. v. Pandora Media, Inc.*, No. 13 Civ. 4037 (LLS), 2015 WL 3526105 (S.D.N.Y. May 28, 2015).

[11] Copyright Office Views, *supra* note 6, at 3 (emphasis added).

[12] Copyright Office Views, *supra* note 1, at 29.

thousands of compositions that cannot be licensed except on a factional basis, including: (1) compositions that have multiple co-owners but are not "joint works" within the meaning of copyright law (including compositions containing "samples" of preexisting copyrighted songs), (2) compositions subject to specific contractual restrictions among co-owners (which copyright law has long permitted) that preclude the composition from being licensed on a 100% basis,[13] and (3) foreign works with multiple co-owners who are represented by different U.S. PROs.[14] DOJ's mandate requires BMI to exclude these compositions from its repertoire or face an enforcement proceeding. Thus, this action would make an enormous number of compositions unlicensable and will chill collaboration among songwriters. Collaboration is how most songs are written today, and writers may cease this practice when confronted with a DOJ mandate that compels them to yield rights they possess under established copyright law in order to qualify their songs for licensing.[15]

The Copyright Office is highly critical of construing the consent decrees to exclude fractional interests, finding that

> an 'exclusionary' interpretation of the consent decree language—notwithstanding fifty years of contrary practice—would not only be highly disruptive, but could significantly undermine the continuing efficacy of blanket collective licensing by ASCAP and BMI.[16]

The Copyright Office further notes:

> Congress made clear its intent that copyright interests could be divided and separately owned. The decrees must be interpreted to respect this fundamental principle, and indeed, as implemented, have accommodated the industry practice of fractional licensing for many decades.[17]

DOJ's interpretation will have other problematic consequences. It will eliminate competition between ASCAP and BMI for songwriters and publishers, since with 100% licenses the representation of any fractional interest is sufficient to license the whole song (and

---

[13] *See id.* at 8-12 (reviewing common arrangements where only fractional rights can be licensed).

[14] The United States is the only jurisdiction that creates a joint tenancy in common among co-owners of a copyright and so permits 100% by co-owners. In all other countries, co-owners can license only their respective fractional interest. "Within the United States, however, it cannot be assumed that a single PRO has the rights to license use of an entire foreign work, because foreign writers individually designate which U.S. PRO will collect for their works or shares thereof." *Id.* at 18 (footnote omitted).

[15] *Id.* at 24 (expressing concern that a 100% licensing interpretation "would chill the highly collaborative atmosphere that characterizes modern songwriting").

[16] *Id.* at 14.

[17] *Id.* at 12-13 (footnote omitted).

presumably collect 100% of the royalties for that song).[18]  Moreover, because ASCAP and BMI have separate rate courts which can and have made different rate determinations, licensees inevitably will seek their 100% licenses from the lower cost PRO, subjecting non-members to lower rates than they would have and should have received from their own PRO.  This will create a "race to the bottom" that will needlessly harm songwriters and other copyright owners.

### C.     Conclusion

For the reasons summarized above, NMPA strongly supports BMI's position that the DOJ's pronouncement is at odds with the language, history and purpose of the Consent Decree.  NMPA supports the status quo, which is consistent with the Consent Decree and for decades has protected the rights of NMPA's members.  Accordingly, NMPA respectfully asks that the Court reject DOJ's pronouncement because it is unsupported by the Consent Decree and will wreak havoc upon NMPA's members and the industry as a whole.

Sincerely,

Danielle Aguirre
Executive Vice President and General Counsel
National Music Publishers' Association

cc:    Kelsey W. Shannon (via U.S Mail and email: kelsey.shannon@usdoj.gov)
       Scott A. Edelman (via U.S. Mail and email: sedelman@milbank.com)
       Atara Miller (via U.S. Mail and email: amiller@milbank.com)

---

[18] The Copyright Office has expressed similar concerns. *See id.* at 26 ("It seems that to require ASCAP and BMI to engage in 100-percent licensing could significantly inhibit such competition.").